IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| PILOT GAMING SYSTEMS, INC. | ) |
| and | ) Civil Action No.: _____ |
| PILOT GAMES, INC., | ) |
| Plaintiffs, | ) **COMPLAINT** |
| v. | ) **Jury Trial Demanded** |
| POLLARD BANKNOTE LIMITED | ) |
| and | ) |
| THREE DIAMOND CORPORATION, | ) |
| Defendants. | ) |

Plaintiffs Pilot Gaming Systems, Inc. ("PGS") and Pilot Games, Inc. ("Pilot") (collectively, "Plaintiffs"), for their Complaint against Defendants Pollard Banknote Limited ("Pollard") and Three Diamond Corporation ("Three Diamond") (collectively, "Defendants"), state and allege as follows:

**JURISDICTION AND VENUE**

1.       This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, as hereinafter more fully appears. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

2. This Court has personal jurisdiction over Pollard because, among other things, Pollard transacts business in Minnesota, markets and distributes accused products in Minnesota, derives substantial revenue from Minnesota activities, and has committed acts of patent infringement in Minnesota.

3. This Court has personal jurisdiction over Three Diamond because Three Diamond is a Minnesota corporation that conducts business in Minnesota and has committed acts of patent infringement in Minnesota.

4. Venue is proper as to Pollard pursuant to 28 U.S.C. § 1391(c)(3) because Pollard is not a resident of the United States and therefore may be sued in any judicial district.

5. Venue is proper as to Three Diamond pursuant to 28 U.S.C. § 1400(b) because Three Diamond is a domestic corporation that resides in this District and has committed acts of infringement in this District.

## PARTIES

6. Plaintiff Pilot Gaming Systems, Inc. is a Delaware corporation with its principal place of business in Reno, Nevada.

7. Plaintiff Pilot Games, Inc. is a Delaware corporation with its principal place of business in Birmingham, Michigan.

8. PGS owns all right, title, and interest in U.S. Patent No. 12,367,737 B1 ("the '737 Patent"), including the right to sue for and collect damages for past infringement.

9. Pilot is an exclusive licensee of the '737 Patent with respect to electronic pull-tab gaming products marketed, sold, and distributed within the State of Minnesota.

2

10.     Defendant Pollard Banknote Limited is a Canadian corporation with its principal place of business at 140 Otter Street, Winnipeg, Manitoba R3T 0M8, Canada. Upon information and belief, Pollard, through its wholly owned subsidiary Diamond Game Enterprises, Inc., operates, markets, and distributes electronic pull-tab gaming products in the United States, including in Minnesota, under the "Diamond Game" brand.

11.     Defendant Three Diamond Corporation is a Minnesota corporation with its principal place of business in Spring Lake Park, Minnesota. Upon information and belief, Three Diamond distributes, markets, supports, installs, services, and/or assists with deployment of accused electronic pull-tab gaming products within Minnesota.

**FACTS**

**A.      The '737 Patent**

12.     On July 22, 2025, the United States Patent and Trademark Office duly and lawfully issued the '737 Patent, titled "Watermarking for Electronic Pull-Tab Gaming," to PGS. A true and correct copy of the '737 Patent is attached hereto as Exhibit A.

13.     The '737 Patent is presumed valid pursuant to 35 U.S.C. § 282.

14.     The '737 Patent generally relates to systems and methods for electronic pull-tab gaming in which a watermark identifier is embedded in winning pull-tab tickets, displayed as a visible watermark on payline symbols, and revealed through an animated roll-up that builds player anticipation before disclosing the final awarded prize.

15.     The '737 Patent contains twenty (20) claims, including independent system Claim 1 and independent method Claim 8.

16.     As described in its Abstract, the '737 Patent discloses and claims:

A pull-tab gaming system and method is described. The pull-tab gaming system includes a wagering system and a plurality of gaming devices. A winning non-zero prize electronic pull-tab ticket includes a watermark identifier. For a winning ticket, the wagering system transmits a non-zero electronic pull-tab ticket having a watermark identifier and a final awarded prize in response to the electronic pull-tab ticket request. For the winning ticket, the gaming device displays a plurality of payline symbols wherein at least one of the payline symbols includes a watermark associated with the watermark identifier. An animated roll-up is then displayed on the gaming device. The animated roll-up displays at least one simulated prize before displaying a final awarded prize. The gaming device displays a plurality of payline symbols, the watermark, and the final awarded prize after displaying the animated roll-up.

'737 Patent, Abstract.

17.     PGS has granted an exclusive license to Pilot to make, have made, use and sell products covered by one or more claims of the '737 Patent in the State of Minnesota.

18.     Pilot is a licensed manufacturer authorized to sell lawful gambling equipment to licensed distributors in the State of Minnesota.

19.     Pilot has marketed and sold electronic pull-tab games that practice one or more claims of the '737 Patent in Minnesota since about December 15, 2024.

20.     Pilot's new and innovative electronic pull-tab games are used by charities and other non-profit organizations and entities in the State of Minnesota as a fundraising tool. They are played on portable touchscreen devices, such as iPads®, at licensed bars, restaurants, and veterans' clubs, with the proceeds funding local charities, youth sports, veterans' groups, and community programs.

21.     Pilot has complied with the patent marking requirements set forth in 35 U.S.C. §287 for each of its electronic pull-tab games that are covered by one or more claims of the '737 Patent.

4

### B.    The Accused Products and Defendants' Conduct

22.    Upon information and belief, beginning in or about January 2026, Pollard began marketing, offering for sale, distributing, and deploying electronic pull-tab gaming products in Minnesota that practice one or more claims of the '737 Patent, operating through its wholly owned subsidiary Diamond Game Enterprises, Inc.

23.    The accused products include, without limitation, the electronic pull-tab games marketed or distributed under the following titles: Bacon Me Crazy, Buffalo Rumble, Crater Cash, Crazy 8's, Dog Sled Dollars, Lore of the North, Seven Diamonds, Shot Clock, Treasure Valley Saloon, Shark Cove Cash, and Down Home Dollars (collectively, the "Accused Products"). Plaintiffs reserve the right to identify additional accused products through discovery.

24.    Upon information and belief, the Accused Products are operated through the Diamond Game electronic pull-tab gaming platform, which includes centrally-managed wagering-server functionality communicatively coupled to tablet-based gaming client devices deployed at licensed venues throughout Minnesota.

25.    Upon information and belief, Defendant Three Diamond has distributed, marketed, installed, serviced, supported, demonstrated, and/or assisted with deployment of the Accused Products at licensed venues in Minnesota.

26.    The Accused Products have been approved for use in Minnesota by the Minnesota Gambling Control Board.

### C.      Pre-Suit Investigation

27.      Prior to filing this Complaint, Plaintiffs conducted a pre-suit investigation of select Accused Products, including gameplay review and inspection of game interfaces, paytables, and display functionality at a licensed Minnesota gaming venue.

28.      Plaintiffs' investigation included field investigations on April 27 and 28, 2026, at a licensed Minnesota venue where at least seven Diamond Game electronic pull-tab game titles were observed, all operating on the Diamond Game platform on gaming devices communicatively coupled to the Diamond Game wagering server.

29.      Plaintiffs' investigation included detailed analysis of the Treasure Valley Saloon electronic pull-tab game operating on the Diamond Game platform, including gameplay recording of a winning-ticket play sequence, on gaming device bearing identifier number PT13877.

30.      The investigation confirmed the presence on the Accused Products of: (a) a wagering system that generates an electronic pull-tab deck including watermarked non-zero-prize tickets; (b) tablet-based gaming devices communicatively coupled to the wagering server; (c) display of payline symbols bearing a visible watermark associated with a watermark identifier; (d) an intermediate graphical representation including an animated roll-up that reveals the final awarded prize; (e) a final graphical representation displaying the payline symbols, watermark, and final awarded prize simultaneously; and (f) a paytable mapping watermarks and payline symbols to prize values.

31.      The Accused Products infringe at least Claims 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 13, and 14 of the '737 Patent, and potentially Claims 5, 12, 15, and 20, pending discovery

6

of source code and internal technical documentation. Plaintiffs reserve the right to assert additional claims of the '737 Patent.

### D.    Asserted Claims

32.    Independent Claim 1 of the '737 Patent recites:

A pull-tab gaming system comprising:

a wagering system that generates an electronic pull-tab deck that include[s] a plurality of electronic pull-tab tickets that include:

    (i)    a plurality of zero prize electronic pull-tab tickets, and

    (ii)    a plurality of non-zero prize electronic pull-tab tickets, wherein at least one of the non-zero prize electronic tickets includes a watermark identifier; and

a plurality of gaming devices communicatively coupled to the wagering systems, wherein each gaming device includes a processor and a memory, wherein:

the plurality of gaming devices includes a first gaming device that is configured to generate an electronic pull-tab request in response to the first gaming device receiving a game play instruction;

the wagering system is configured to transmit, to the first gaming device, a first non-zero prize electronic pull-tab ticket having the watermark identifier and a final awarded prize from the plurality of non-zero prize electronic pull-tab tickets and in response to the electronic pull-tab ticket request;

the first gaming device is configured to display, for the first non-zero electronic pull tab ticket and on a display device associated with the first gaming device, a plurality of payline symbols, the plurality of payline symbols including at least one payline symbol having a watermark depicted thereon and associated with the watermark identifier;

the display device associated with the first gaming device is configured to display an intermediate graphical user interface (GUI) representation, the intermediate GUI representation including an animated roll-up that reveals the final awarded prize;

the display device associated with the first gaming device is further configured to display a final GUI representation after the animated roll-up,

the final GUI representation including the plurality of payline symbols, the watermark, and the final awarded prize; and

the display device associated the first gaming device is further configured to display a paytable that presents a plurality of final awarded prizes corresponding to one or more watermarks and payline symbols.

'737 Patent, col. 48, l. 49 – col. 49, l. 27.

33. Independent Claim 8 of the '737 Patent recites the corresponding electronic pull-tab gaming method, whose steps parallel element-for-element the system elements of Claim 1. *See* '737 Patent, col. 49, l. 47 – col. 50, l. 22.

34. The following is an illustrative element-by-element claim chart mapping Claim 1 of the '737 Patent to the Accused Products based on Plaintiffs' pre-suit investigation. Screenshots referenced below were captured during field investigation on April 27-28, 2026, from gaming device number PT13877 operating the Treasure Valley Saloon game on the Diamond Game platform at a licensed Minnesota venue:

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Preamble**<br><br>*"A pull-tab gaming system comprising:"* | The accused product is the Diamond Game electronic pull-tab platform operated by Pollard Banknote Limited through its wholly owned subsidiary Diamond Game Enterprises, Inc. The platform comprises Diamond Game's centrally managed wagering server communicatively coupled to a population of tablet-based gaming devices deployed at licensed Minnesota venues. Together, the wagering server and the gaming devices constitute a pull-tab gaming system within the meaning of the preamble. The '737 Patent describes this architecture at col. 7, lines 18-35 (Fig. 1A): a pull-tab gaming system 100 that includes a wagering system 102 communicatively coupled to gaming client devices 108 over a wide area network 106. Seven different Diamond Game titles were observed at the same Minnesota venue on April 27-28, 2026, confirming population-scale platform deployment. Gaming device PT13877 is one such device in that population; the PT13877 identifier is visible |

8

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
|  | throughout the filmed gameplay sequence. The Game Info menu displays the "DiamondGame" mark on the Prizes and Pay Lines pages (Screenshots A, B, C), identifying Diamond Game as the platform and game-software manufacturer.  *Screenshot A: Game Info Prizes page 1 showing DiamondGame mark and standard paytable*  *Screenshot C: Pay Lines diagram showing DiamondGame mark and 14-line payline definitions* |

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Element 1.a**<br><br>*"a wagering system that generates an electronic pull-tab deck that include a plurality of electronic pull-tab tickets that include: (i) a plurality of zero prize electronic pull-tab tickets, and (ii) a plurality of non-zero prize electronic pull-tab tickets, wherein at least one of the non-zero prize electronic pull-tab tickets includes a watermark identifier; and"* | Diamond Game's wagering server generates a finite-pool electronic pull-tab deck for each Treasure Valley Saloon deck instance. The deck contains both zero-prize tickets and non-zero-prize tickets, distributed across multiple prize tiers with defined ticket counts per tier.<br><br>The '737 Patent describes this deck architecture in the Summary at col. 1, lines 55-65. The deck generator server 505 operates as the central authority for generation of finite-pool decks of predetermined electronic pull-tab results (col. 19, line 55 – col. 20, line 5).<br><br>Screenshots D and D-pre each show a resolved losing ticket: the 3x5 symbol grid displays saloon-themed symbols with a "Better luck next time" banner, no "WIN" amount, and no watermark dot pattern on any symbol. These are zero-prize electronic pull-tab tickets.<br><br><br><br>*Screenshot D: Zero-prize ticket – no watermark, "Better luck next time"*<br><br>The Game Info Prizes page for the Shooting Gallery Extended Reveal (Screenshot B) displays eight prize tiers ($75, $60, $50, $45, $40, $35, $30, $25), each showing three crossed-pistol payline symbols carrying a distinct dot-pattern watermark. The "# WINNERS" enumerations identify the total number of non-zero-prize tickets at each prize level within the finite-pool deck. |

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| |  *Screenshot B: Shooting Gallery Extended Reveal paytable -- eight watermarked prize tiers*<br><br>Each non-zero-prize ticket in the watermarked tiers includes a watermark identifier, the data element in the ticket data structure that determines which dot-pattern watermark the gaming device renders on the crossed-pistol payline symbols. The '737 Patent teaches the watermark identifier at col. 20, lines 55-65, and illustrates its encoding at col. 21, lines 10-50. |

11

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Element 1.b**<br><br>*"a plurality of gaming devices communicatively coupled to the wagering system, wherein each gaming device includes a processor and a memory, wherein:"* | Diamond Game deploys a plurality of tablet-based gaming devices communicatively coupled to Diamond Game's wagering server at licensed venues. The gaming device bearing identifier PT13877 is one such device. The '737 Patent describes the gaming client device 108 as, for example, an iPad that communicates with the wagering system 102 using a wide area network 106 (col. 7, lines 20-32). The Patent further describes the player interface unit 400 as including a central computing element 402 with a processor 404 and memory storage 406, a touchscreen color display 408, and a network interface component 410 providing network access via Wi-Fi (col. 16, line 60 – col. 17, line 20). The player interface unit 400 may be a tablet computing device running iOS or Android operating systems (col. 17, lines 20-22).<br><br>The accused Diamond Game gaming devices are tablet computing devices that include a processor and a memory, as required to execute the Treasure Valley Saloon game software, render the 3x5 symbol grid, process player input through the touchscreen interface, communicate with the wagering server to request and receive electronic pull-tab tickets, and manage the on-screen cash meter, wager display, and WIN meter visible throughout the gameplay sequence (Screenshot D through Screenshot L). The device identifier PT13877 is visible at the bottom of the display throughout the filmed session, identifying the specific hardware unit.<br><br>Six Diamond Game electronic pull-tab game titles were filmed at the same Minnesota venue, each executing on Diamond Game tablet gaming devices communicatively coupled to the same wagering server infrastructure, confirming deployment of a plurality of gaming devices coupled to the wagering system. |

| Element 1.c<br><br>*"the plurality of gaming devices includes a first gaming device that is configured to generate an electronic pull-tab ticket request in response to the first gaming device receiving a game play instruction;"* | PT13877 is configured to generate an electronic pull-tab ticket request to the Diamond Game wagering server in response to receiving a game play instruction from the player. The '737 Patent describes this sequence at col. 9, lines 23-43: the game play instruction may be embodied by simply hitting a "play" button; upon receipt, the gaming device requests an electronic pull-tab ticket from the wagering system.<br><br>The on-device evidence documents this sequence through the cash-meter transition across the winning-ticket play. Screenshot D-pre shows the pre-play state with the cash meter at $92.50 and the PLAY button visible. The player taps the PLAY button, which is the game play instruction. Screenshot E shows the post-play OPEN screen with the cash meter decremented to $91.50, a $1.00 reduction corresponding to the wager amount . This transition confirms that PT13877 generated an electronic pull-tab ticket request and received a ticket in response. The PLAY button on "Screenshot D-pre" is replaced by the OPEN button on "Screenshot E," confirming that the device transitioned from the play-ready state to the ticket-received state in response to the game play instruction.<br><br><br><br>*Screenshot D-pre: Pre-play state with cash meter at $92.50 and PLAY button visible* |

13

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| | <br>*Screenshot E: Post-play OPEN screen with cash meter at $91.50* |

| Element 1.d | Diamond Game's wagering server is configured to transmit to PT13877, a non-zero prize electronic pull-tab ticket carrying the watermark identifier and the final awarded prize, in response to the electronic pull-tab ticket request generated when the player tapped the PLAY button. Electronic pull-tab gaming is a finite-pool, predetermined-outcome architecture. The wagering server is the sole authority for deck generation, ticket-pool management, and outcome determination across all connected devices. *See* '737 Patent col. 19, line 55 – col. 20, line 5. Each non-zero-prize ticket in the deck is a discrete data structure encoding the watermark identifier and the final awarded prize as embedded data elements. *See* col. 20, lines 55-65; col. 21, lines 10-50. The gaming device does not independently generate outcomes, select watermark identifiers, or determine prize values. |
|---|---|
| *"the wagering system is configured to transmit, to the first gaming device, a first non-zero prize electronic pull-tab ticket having the watermark identifier and a final awarded prize from the plurality of non-zero prize electronic pull-tab tickets and in response to the electronic pull-tab ticket request;"* | The on-device evidence confirms the transmission contents at three downstream points in the gameplay sequence, and the result necessarily implies the claimed transmission contents. |
| | First, after the player taps PLAY and the cash meter decrements from $92.50 to $91.50 (Screenshot E), the gaming device displays three crossed-pistol payline symbols in the bottom row, each carrying a specific dot-pattern watermark (Screenshot F). The dot pattern is not a static graphic. The Game Info paytable (Screenshot B) shows eight distinct dot patterns across eight prize tiers, each associated with a different prize value. The pattern displayed on the crossed-pistol symbols in Screenshot F matches the $50.00 row of the paytable. A different ticket drawn from the same deck would display a different dot pattern corresponding to a different prize value. |

15



*Screenshot F: Bottom row crossed-pistol payline symbols with dot-pattern watermark*

Second, the animated roll-up sequence (Screenshots G through K, below) progresses from $0.00 to $50.00, resolving to the prize value that corresponds to the specific dot pattern displayed on the payline symbols at Screenshot F.

Third, the final state (Screenshot L) shows the cash meter at $141.50, reflecting the $91.50 pre-roll-up balance plus the $50.00 prize credit, with the "SHOOTING GALLERY EXTENDED REVEAL PAYS $50.00" banner confirming the final awarded prize.

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| |  *Screenshot L: Final state showing cash meter at $141.50 and $50.00 prize confirmation*<br><br>The gaming device cannot independently select which dot pattern to display or which prize to award. Electronic pull-tab gaming operates on a finite-pool deck architecture in which the wagering server generates the deck, manages the ticket pool across all connected devices, and centrally determines each ticket outcome as a predetermined entry drawn from the server-managed pool (col. 19, line 55 – col. col. 20, line 5). Each non-zero-prize ticket in the deck carries a watermark identifier that determines the specific dot pattern rendered on the payline symbols and that is associated with the final awarded prize for that ticket (col. 20, lines 55-65; col. 21, lines 10-50). Because the watermark identifier varies from ticket to ticket across the finite-pool deck, and because each identifier maps deterministically to one and only one dot pattern and one and only one prize value through the paytable, the specific dot pattern and prize value observed on PT13877 during the filmed play necessarily originated in the ticket data transmitted from the wagering server. There is no technically feasible alternative in which PT13877 produces the observed output sequence without receiving from the wagering server a non-zero prize electronic pull-tab ticket carrying the watermark identifier and the final awarded prize of $50.00. |

17

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Element 1.e**<br><br>*"the first gaming device is configured to display, for the first non-zero electronic pull tab ticket and on a display device associated with the first gaming device, a plurality of payline symbols, the plurality of payline symbols including at least one payline symbol having a watermark depicted thereon and associated with the watermark identifier;"* | PT13877 displays, for the non-zero prize electronic pull-tab ticket received from the wagering server, a plurality of payline symbols on its touchscreen display, including at least one payline symbol having a watermark depicted thereon and associated with the watermark identifier transmitted in the ticket data.<br><br>Screenshot F shows the result. After the player taps PLAY and opens the bottom row, the 3x5 symbol grid displays saloon-themed payline symbols across three rows. The bottom row contains three crossed-pistol payline symbols, each carrying a dot-pattern watermark depicted directly on the symbol face. The dots are on the crossed-pistol symbols. The '737 Patent defines the watermark as an identifying image or pattern that is proximate to a payline symbol, or integrated into the payline symbol, and that in combination with the payline symbols identifies a prize in a paytable (col. 20, lines 22-35). In the illustrative embodiments, the watermark presented on the gaming client device 108 is encoded with visible patterns that, in combination with the payline symbols, identify a prize in a paytable (col. 20, lines 30-35).<br><br><br><br>*Screenshot F: Bottom row with dot-pattern watermark on crossed-pistol payline symbols*<br><br>The dot pattern on the crossed-pistol symbols in Screenshot F is not a static decorative element. It is the visual output of the watermark identifier transmitted in the ticket data from the wagering server. The Game Info paytable (Screenshot B, |

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| | Screenshot B-crop) shows eight distinct dot patterns across eight prize tiers on the Shooting Gallery Extended Reveal page, each pattern displayed on three crossed-pistol symbols and each associated with a different prize value. The pattern visible on the crossed-pistol symbols in Screenshot F matches the $50.00 row of the paytable. A different ticket drawn from the same deck would display a different dot pattern corresponding to a different prize value, because a different watermark identifier in the ticket data would cause a different pattern to be rendered on the symbol. The watermark depicted on the payline symbol is thus associated with the watermark identifier, as the claim requires: the identifier in the ticket data determined which pattern was rendered, and the rendered pattern maps through the paytable to the $50.00 prize.<br><br><br>*Screenshot B-crop: Enlarged view of $60, $50, and $45 rows showing distinct dot patterns per tier*<br><br>The final awarded prize ($50.00) is not displayed on Screenshot F – the cash meter remains at $91.50 and the WIN meter shows no value – consistent with the '737 Patent's description of the first graphical representation as displaying the payline combination and watermark without the final awarded prize. *See* col. 9, lines 60-67. |

| **Element 1.f** | PT13877 displays an intermediate graphical user interface (GUI) representation that includes an animated roll-up that reveals the final awarded prize of $50.00. The '737 Patent describes the intermediate graphical representation at col. 5, lines 28-45 as a transient graphical representation typically embodied as an animated roll-up. The animated roll-up may include simulated intermediate prizes that build anticipation into the prize reveal process, but the simulated intermediate prize does not impact the final awarded prize. *See* col. 5, line 55 – col. 6, line 10. The extended animated roll-up is described at col. 7, lines 3-17 as an extension of the standard animated roll-up that simulates awarding additional prizes without affecting the final awarded prize. |
|---|---|
| *"the display device associated with the first gaming device is configured to display an intermediate graphical user interface (GUI) representation, the intermediate GUI representation including an animated roll-up that reveals the final awarded prize;"* | After the first graphical representation displaying the crossed-pistol payline symbols with the dot-pattern watermark (Screenshot F), PT13877's display transitions to the Shooting Gallery Extended Reveal sequence – a saloon-interior shooting scene. Screenshots G through K document this intermediate GUI representation. Screenshot G shows the animated counter at $0.00 and Screenshot I shows progression to $21.20. Screenshot J shows the counter resolving to $50.00 – the final awarded prize revealed through the animated roll-up. Screenshot K shows the "YOU WIN! $50.00" overlay, completing the intermediate GUI representation. |
| |  |
| | *Screenshot G: Beginning of animated roll-up, running counter at $0.00* |



*Screenshot H: Roll-up progression, counter at $4.80 with $8.00 target-hit award*



*Screenshot I: Roll-up progression, counter at $21.20*



*Screenshot J: Roll-up resolves to $50.00 final awarded prize*



*Screenshot K: "YOU WIN! $50.00" overlay completing intermediate GUI representation*

Both the standard animated roll-up and the extended animated roll-up satisfy Claim 1's recitation of "an animated roll-up that reveals the final awarded prize." The '737 Patent teaches the extended roll-up as an extension of the standard roll-up. *See* col. 12, lines 14-15. Pollard refers to this feature as the "Shooting Gallery Extended Reveal" – terminology that maps directly to the specification's use of the term "reveal."

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Element 1.g**<br><br>*"the display device associated with the first gaming device is further configured to display a final GUI representation after the animated roll-up, the final GUI representation including the plurality of payline symbols, the watermark, and the final awarded prize; and"* | PT13877 displays a final GUI representation after the animated roll-up that simultaneously includes the plurality of payline symbols, the watermark, and the final awarded prize. The '737 Patent describes the final graphical representation at col. 12, lines 36-48 and col. 11, lines 28-32 as including the payline symbol combination, the watermark, and the final awarded prize revealed during the animated roll-up.<br><br><br><br>*Screenshot L: Final GUI representation showing payline symbols, watermark, and $50.00 prize*<br><br>Screenshot L documents the final GUI representation on PT13877. After the Shooting Gallery Extended Reveal animated roll-up resolves to $50.00 (Screenshot J) and the "YOU WIN! $50.00" overlay completes (Screenshot K), the display returns to the 3x5 symbol grid. The bottom row shows the same three crossed-pistol payline symbols with the same dot-pattern watermark as Screenshot F. The "SHOOTING GALLERY EXTENDED REVEAL PAYS $50.00" banner displays the final awarded prize. The WIN meter reads $50.00 and the cash meter reads $141.50, reflecting the $91.50 pre-roll-up balance plus the $50.00 prize credit. All three required elements – payline symbols, the watermark, and the final awarded prize – are simultaneously present in the final GUI representation. |

23

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| **Element 1.h**<br><br>*"the display device associated with the first gaming device is further configured to display a paytable that presents a plurality of final awarded prizes corresponding to one or more watermarks and payline symbols."* | PT13877 displays a paytable presenting a plurality of final awarded prizes corresponding to one or more watermarks and payline symbols. Screenshot B shows the Shooting Gallery Extended Reveal paytable on the PT13877: eight prize tiers ($75, $60, $50, $45, $40, $35, $30, $25), each displaying three crossed-pistol payline symbols bearing a distinct dot-pattern watermark, with prize value and winner count per deck listed beside each tier. Screenshot B-crop provides an enlarged view of the $60, $50, and $45 tiers confirming that the dot patterns are visually distinct tier to tier. The $50.00 tier shows the same dot pattern visible on the crossed-pistol symbols during gameplay at Screenshot F and in the final GUI representation at Screenshot L.<br><br><br><br>*Screenshot B: Shooting Gallery Extended Reveal paytable with eight watermarked prize tiers* |

24

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
|  |  *Screenshot B-crop: Enlarged view showing distinct dot patterns at $60, $50, and $45 tiers* Screenshot A shows the standard non-watermarked prize-tier paytable. Screenshot C shows the 14-line Pay Lines diagram. *Screenshot A: Standard paytable with non-watermarked prize tiers* |

| Claim Element | Accused Product: Treasure Valley Saloon |
|---|---|
| | *Screenshot C: 14-line Pay Lines diagram* This element closes the data-to-display pipeline established across Element 1.a through 1.g: the watermark identifier embedded in the ticket (1.a) is transmitted by the wagering server (1.d), rendered as a visible dot pattern on the payline symbols (1.e), revealed through the animated roll-up (1.f), and displayed in the final GUI representation (1.g). The paytable maps the visible watermark pattern to the corresponding prize value, confirming the functional relationship between the data layer and the display layer as the claim requires. |

35.    Claim 8 of the '737 Patent recites the corresponding pull-tab gaming method whose steps parallel, element-for-element the system elements of Claim 1. The Diamond Game platform, as documented in the pre-suit investigation described above, performs each method step of Claim 8 for the same reasons set forth in the Claim 1 element-by-element analysis, which is incorporated herein by reference.

## CAUSES OF ACTION

### Count I – Direct Infringement Against Pollard
(35 U.S.C. § 271(a))

36.     Plaintiffs restate and reallege paragraphs 1 through 35 and incorporate them herein by reference.

37.     Pollard has directly infringed and continues to directly infringe one or more claims of the '737 Patent, including at least Claims 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 13, and 14, by operating, controlling, or deriving benefit from the complete accused system and also making, using, selling, offering for sale, importing, marketing, distributing, and/or deploying the Accused Products in the United States, without authorization from Plaintiffs, in violation of 35 U.S.C. § 271(a).

38.     Pollard's infringement is literal. To the extent any claim element is not literally met, Pollard's infringement is under the doctrine of equivalents because the accused Diamond Game platform performs substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim limitation.

39.     As a result of Pollard's infringement, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, but not less than a reasonable royalty, as required by 35 U.S.C. § 284.

40.     Plaintiffs will continue to suffer irreparable injury from Pollard's ongoing infringement unless and until enjoined by this Court. Plaintiffs have no adequate remedy at law.

27

### Count II – Direct Infringement Against Three Diamond
(35 U.S.C. § 271(a))

41.     Plaintiffs restate and reallege paragraphs 1 through 40 and incorporate them herein by reference.

42.     Three Diamond has directly infringed and continues to directly infringe one or more claims of the '737 Patent, including at least Claims 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 13, and 14, by operating, controlling, or deriving benefit from the complete accused system and also using, selling, offering for sale, marketing, distributing, and/or deploying the Accused Products in Minnesota, without authorization from Plaintiffs, in violation of 35 U.S.C. § 271(a).

43.     Three Diamond's infringement is literal. To the extent any claim element is not literally met, Three Diamond's infringement is under the doctrine of equivalents because the accused Diamond Game platform performs substantially the same function in substantially the same way to achieve substantially the same result as the corresponding claim limitation.

44.     As a result of Three Diamond's infringement, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, but not less than a reasonable royalty, as required by 35 U.S.C. § 284.

45.     Plaintiffs will continue to suffer irreparable injury from Three Diamond's ongoing infringement unless and until enjoined by this Court. Plaintiffs have no adequate remedy at law.

**WILLFUL INFRINGEMENT**

46.    Upon information and belief, Pollard had actual or constructive notice of the '737 Patent prior to commencement of this action. Upon information and belief, Pollard has acted knowingly and intentionally and in reckless disregard of the Plaintiffs' rights in infringing the '737 Patent. Upon information and belief, Pollard has willfully infringed the '737 Patent.

47.    Upon information and belief, Three Diamond had actual or constructive notice of the '737 Patent prior to commencement of this action. Upon information and belief, Three Diamond has acted knowingly and intentionally and in reckless disregard of the Plaintiffs' rights in infringing the '737 Patent. Upon information and belief, Three Diamond has willfully infringed the '737 Patent.

**DEMAND FOR JURY TRIAL**

The Plaintiffs demand a trial by jury on all issues triable to a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendants, jointly and severally, as follows:

1.    A judgment that Defendants have infringed one or more claims of the '737 Patent under 35 U.S.C. § 271(a);

2.    A judgment that Defendants' infringement has been literal and/or under the doctrine of equivalents;

3.    A preliminary and permanent injunction pursuant to 35 U.S.C. § 283 enjoining Defendants, their officers, directors, agents, servants, employees, attorneys,

29

successors, assigns, and all persons in active concert or participation with them from making, using, selling, offering for sale, importing, distributing, or deploying the Accused Products or any colorable imitation thereof in the United States during the term of the '737 Patent;

4.      An award of damages adequate to compensate Plaintiffs for Defendants' infringement pursuant to 35 U.S.C. § 284, including all damages proven at trial, but in no event, less than a reasonable royalty, together with pre-judgment and post-judgment interest and costs;

5.      An accounting of Defendants' infringing sales, revenues, and profits;

6.      An award of enhanced damages up to three times the amount of compensatory damages pursuant to 35 U.S.C. § 284 if Defendants' infringement is found to be willful;

7.      A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285; and

8.      Such other and further relief as the Court deems just and proper.


Dated: May 22, 2026.                    /s/Alan M. Anderson
                                        Alan M. Anderson (149500)
                                        L. Reagan Florence (0396468)
                                        Matthew Palen (317895)
                                            *Of counsel*
                                        Alan Anderson Law Firm LLC
                                        Crescent Ridge Corporate Center
                                        11100 Wayzata Blvd., Suite 545
                                        Minneapolis, MN 55305
                                        Tel: (612) 756-7000
                                        Fax: (612) 756-7050
                                        Email: aanderson@anderson-lawfirm.com


30

rflorence@anderson-lawfirm.com
mpalen@comcast.net

*Attorneys for Plaintiffs*
*Pilot Gaming Systems, Inc. and*
*Pilot Games, Inc.*